[No. B030356. Second Dist., Div. Two. Feb. 1, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
RODERICK GARNER, Defendant and Appellant.

**COUNSEL**

Thomas J. L. Virant, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Carol Wendelin Pollack and John A. O'Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GATES, J.**—Defendant Roderick Garner appeals from the judgment entered following a jury trial that resulted in his conviction of second degree murder. ▆ He makes numerous contentions whose merit, or lack thereof, need not detain us since this proceeding was so fundamentally flawed from its inception that its result cannot possibly be sustained.

The prosecution's entire case-in-chief consisted solely of (1) an autopsy report indicating that a Phillip Matthews had died "as a consequence of multiple gunshot wounds," and (2) a reading into the record of the testimony given by the one and only witness produced at appellant's preliminary examination, i.e., Alonso Phillips. This latter procedure, which constituted

*the only evidence* connecting appellant to the crime, was permitted because the witness, having subsequently advised the prosecution his identification of appellant at that hearing had been a lie, refused to testify at trial asserting that to do so *would permit the prosecution to charge and convict him of having committed perjury!*[1]

The deputy district attorney, of course, was well aware that if the jury was to be apprised of the reason the court was sustaining the witness's refusal to testify, it would severely damage his case. In fact, he even sought to preclude the witness from being required to take the stand at all, stating, "I don't believe that the witness should be allowed to invoke the Fifth in front of the jury. The reason for that, I think it leaves the jury to speculate as to his reasons for invoking the Fifth. [¶] That could be fairly prejudicial and the jury to sway from the evidence."

While the trial court was unwilling to go quite so far, it did allow the witness to refuse to testify or *to submit to cross-examination concerning his reasons for so refusing*. Were this not enough, immediately after his earlier allegedly perjurious testimony had been read, the court commanded the jury as follows: "When a witness refuses to testify as to any matter, [basing his refusal on] the constitutional privilege against self-incrimination, you are not to draw from that fact any inference as to the credibility of the witness, or as to the guilt or innocence of the defendant."

■ While this CALJIC No. 2.25 advisement is quite appropriate under ordinary circumstances where the witness fears his own potential prosecution for a nontestimonial crime, it is entirely unwarranted in the present unique context. That is to say, when a witness refuses to respond to relevant questioning upon the express averment that to do so would reveal the falsity of his earlier testimony, it is eminently reasonable and proper for the jury to

[1] At the preliminary examination Phillips had testified that he was a member of Circle City Piru, a blood gang. He asserted that on the evening of November 27, 1986, he had seen appellant and other members of the enemy Front Street Crip gang in a car near 105th and Central. Soon thereafter, despite the darkness and the distances involved, he claimed to have recognized appellant as the person who had fired several rounds at him after first having killed Matthews.

At trial, however, it was stipulated in open court that Phillips told the deputy district attorney in charge of this prosecution, "that at the preliminary hearing he did make a positive identification of the defendant, but that he was lying when he did so. He said that it might be the defendant, but he could not be sure because he did not see the shooter's face. [¶] Further, in the same conversation when [the deputy district attorney] continued to question Mr. Phillips, he asked Mr. Phillips 'Why he had ID'd the defendant at the preliminary hearing,' [and] he said, 'It was because of the Front Street Crips were in the courtroom,' and he wanted to 'fuck with them.' He was also . . . 'pissed off at Rod.' [¶] Further, he advised [the deputy district attorney] that he does not like Rod, but doesn't want him convicted on his perjured testimony."

draw an unfavorable inference therefrom regarding his credibility. In fact, since a witness's intention to commit *future* perjury could not possibly serve to sustain an invocation of the privilege, only two truly rational inferences are possible, (1) his earlier testimony was, indeed, false, or (2) he is currently lying concerning his reason for refusing to testify.

Further, where the witness's earlier avowedly false testimony provides a basis for determining the accused's guilt, the jury ought properly to be instructed that it should, rather than it should not, draw all appropriate inferences regarding the defendant's actual guilt or innocence from the witness's refusal to speak.

However, and notwithstanding appellant's objections, here the court once more repeated this improper admonishment in its final instructions to the jury and the prosecutor stressed it both in his opening and closing arguments.[2] Thus largely shielded from the risk of logical and rational rebuttal, the deputy district attorney was free to, and did, urge the jury to conclude the witness's refusal to testify was due exclusively to his fear of retaliation from opposing gang members.

So far as we are aware, only one California decision, *People* v. *Maxwell* (1979) 94 Cal.App.3d 562 [156 Cal.Rptr. 630], has ever condoned any procedure remotely comparable to that which occurred here. Oddly, the court in *Maxwell,* at pages 570-571, purported to rely upon the earlier decision in *People* v. *Lawrence* (1959) 168 Cal.App.2d 510 [336 P.2d 189], even though *Lawrence,* which predated Evidence Code section 240, subdivision (1), had upheld, at page 518, a trial court's refusal to allow the defense to introduce a witness's prior testimony under similar circumstances.

However, regardless of the soundness of *Maxwell*'s abstract commentary, we need not quarrel with its ultimate conclusion since the situation there under review was so manifestly distinguishable from the case before us. The conviction in *Maxwell* had occurred in a nonjury trial where the prosecuting witness, after first testifying she "was presently in love with defendant,"

---

[2] In his opening argument the deputy district attorney stated: "There is another point and that is the instruction that the judge read to you before Alonso Phillips took the stand. That is the Fifth Amendment instruction. She will tell you, and tell you again, I believe, you can't consider the fact that a person took the Fifth Amendment as to their credibility. You can't use that at all. A person has an absolute right to claim the Fifth Amendment. So, please don't consider that in your deliberations."

In his closing argument he again urged, "One other general point. He [defense counsel] argues about Mr. Phillips, quote; 'not making himself available here.' Taking the Fifth Amendment. You can't consider his credibility. He argued credibility. [¶] The judge is going to tell you you cannot consider the fact the witness invoked a constitutional right. You can't consider that. Please don't. That is just not right."

(94 Cal.App.3d at p. 578) refused to repeat the accusation of kidnapping she had made against him at his preliminary examination. Not only was the accused's identity not in issue, even if that particular portion of the witness's earlier testimony were deemed false, such a possibility did not preclude the trial judge, sitting as the trier of fact unhindered by an inappropriate CALJIC No. 2.25 instruction, from concluding that the defendant, nonetheless, had been guilty of the lesser offense of false imprisonment.

As the court in *Maxwell* pointed out, "It is true that [the witness] Russell admitted that a truthful answer with respect to whether she met defendant voluntarily that night at the Jack-in-the-Box would 'conflict' with her prior testimony. Even if this admission is deemed to establish that her testimony was false in part (which is the most it could show), the trier of fact could 'accept as true' the remainder of her testimony. Therefore, Russell's testimony as to all other matters constitutes evidence of solid value sufficient to sustain defendant's conviction. There was, therefore, no due process violation." (94 Cal.App.3d at p. 578.)

 Here, however, *the sole evidence* of our appellant's guilt came from the lips of a witness who, at trial, swore during an in camera hearing whose nature was carefully concealed from the triers of fact, that his identification of appellant as the killer had been a lie. Such a scenario stands in stark contrast to that which our high court sustained in *People* v. *Ford* (1981) 30 Cal.3d 209 [178 Cal.Rptr. 196, 635 P.2d 1176]; and *People* v. *Chavez* (1980) 26 Cal.3d 334 [161 Cal.Rptr. 762, 605 P.2d 401].

In each of these proceedings, as was expressly stressed in *Chavez,* "the defendant . . . was accorded the full literal protection proscribed by [article I, section 15 of the California Constitution]. Gregory Angel, the 'witness against the defendant,' *testified at trial,* and at that time defendant enjoyed the right to 'confront' the witness and *to cross-examine him fully as to all of his statements which were submitted to the trier of fact. . . ."* (26 Cal.3d at p. 353, italics added.)

Similarly, in *People* v. *Castaneda* (1978) 81 Mich. App. 453 [265 N.W.2d 367], which *Maxwell* noted was the only case uncovered by its research, the primary witness against the defendant was a police officer and, as the court emphasized at pages 373-374, even the recanting informant appeared before the jury which was afforded the opportunity to hear not only his testimony at the defendant's initial hearing where it had been unfavorable, but also at a later hearing where it had exculpated him. In each instance the witness had been "vigorously cross-examined."

In the case before us, of course, appellant was completely precluded from questioning his sole accuser concerning a primary issue, i.e., the witness's

admission of false swearing, since such admission had occurred only after appellant's preliminary examination had been completed. As a consequence, as to the most basic question in controversy, appellant was denied both his constitutional right to confront his accuser and to conduct a meaningful cross-examination. These deprivations, particularly when combined with the court's repeated CALJIC No. 2.25 admonitions, effectively precluded the jury from determining when, if ever, the one witness against him was speaking truthfully.

■ When the People wish to go forward in reliance upon the testimony of a recanting witness, fundamental fairness would require, at a minimum, that the jury (1) be advised precisely why the witness is being allowed to refuse to testify, i.e., an alleged fear of a perjury prosecution, and (2) be instructed that they should draw all reasonable and appropriate inferences therefrom concerning the witness's credibility and the guilt or innocence of the accused.

■ In fact, in instances such as the present, we believe the truly preferable approach, as appellant urges, would have been for the trial court to condition the People's request to introduce Phillips's allegedly perjured testimony upon its granting him immunity from prosecution pursuant to Penal Code section 1324. Respondent has suggested no reason why this procedure would have been prejudicial to it and we can conceive of none.

Obviously the People could not, in good conscience, have urged that the very testimony on which they asked to have appellant imprisoned for the balance of his life, was so untrustworthy they wished to retain the right to prosecute their declarant for perjury. They already knew, of course, that Phillips claimed to have testified falsely. Under such circumstances one might have hoped the prosecution would have been as desirous as the defense to see the truth prevail, whatever that might be. Further, of course, a grant of immunity for past perjury would not have precluded the district attorney from proceeding against Phillips if it deemed his trial testimony to be untrue. (Pen. Code, § 1324; see *People* v. *Hathcock* (1971) 17 Cal.App.3d 646 [95 Cal.Rptr. 221].)

In this fashion the prosecution could have gone forward despite Phillips' avowed change of heart and yet accorded appellant those rights guaranteed him by both state and federal Constitutions exactly as had occurred in *Ford* and *Chavez, supra*. That is to say, the arbiters of appellant's guilt or innocence would actually have observed the confrontation between accuser and accused and heard each of Phillips's conflicting tales fully and fairly tested by each parties' cross-examination, before they were called upon to determine which version to credit.

Just as the defense may not demand an inappropriate invocation of the district attorney's exclusive Penal Code section 1324 prerogative (*People* v. *Galante* (1983) 143 Cal.App.3d 709, 713 [192 Cal.Rptr. 184]), neither should the prosecution object to a trial court conditioning a favorable evidentiary ruling upon its exercise when, as here, the only consequence of such a grant will be to afford the jury an opportunity to perform its truth-seeking duties with as full a knowledge of the determinative facts as possible. It is entirely possible, of course, that the reluctant witness may abandon his amended assertions after he once again has been sworn to tell the truth, but even if he does not, the prosecution will be free to demonstrate through its questioning that it is his recantation, rather than his prior testimony, that should be deemed unworthy of belief.

*People* v. *Priester* (1983) 98 App.Div.2d 820 [470 N.Y.S.2d 478], was a case quite comparable to our own, though not nearly as compelling since there the defendant's identity was not in issue and the subject witness was apparently but one of several. Nonetheless, it was there held to have been prejudicial error for the district attorney to prevent a witness who already had testified for the People from changing her testimony for fear of a perjury prosecution. The *Priester* court reversed and ordered a new trial "conditioned on the grant of immunity" to the recanting witness.

Lest there be any confusion concerning the extremely limited nature of the remedy we here recommend, we emphasize that a need therefor will arise if, *and only if,* (1) the witness's invocation of the privilege is based upon a claimed fear of a perjury prosecution, and (2) it is the People who wish to use this witness's earlier, and assertedly false, testimony as evidence against the accused. While the district attorney may not be required to seek a grant of immunity even in such an instance, his request to make affirmative use of that testimony may be conditioned upon his willingness to expose the witness to full and complete cross-examination before the triers of fact.

As we noted at the outset, since the present judgment cannot be allowed to stand, we need not pass upon the merits of appellant's several other contentions. One, however, does warrant additional comment.

The defense produced a number of witnesses who swore appellant had been standing in front of his own residence talking to others when the fatal shots were heard in the distance. Further, since the recalcitrant witness, Phillips, had mentioned seeing appellant only minutes before the shooting in a car similar to the one appellant owned, and appellant acknowledged he had driven in the area and attempted to frighten rival gang members much

earlier in the day, the defense sought to establish that at the crucial moment appellant's car had been in the possession of another to whom he had lent it.

Appellant and his mother had identified this party, Lance Maciel Johnson, also known as Mark or Maciel Jackson, to the police. Despite certain initial confusion resulting from the multiple names by which he was known, Officer Warren Winston did succeed in locating and interviewing him. Johnson not only confirmed appellant's statements regarding his use of appellant's car, he even admitted he had been present in that vehicle at, or near, the scene at the time of the homicide.[3]

However, when Johnson, who concededly had been properly subpoenaed by the defense, failed to appear at trial, the prosecution not only attempted to preclude the jury from learning of his admissions, it even sought to prevent them from knowing he truly existed. Whenever the defense posed a question designed to establish what information appellant and his mother had given to the police concerning Johnson's identity, statements obviously not introduced to prove the truth of any matter asserted therein, but merely to demonstrate they had been made, the deputy district attorney would interpose, and the court would sustain, a meritless hearsay objection.[4]

Ultimately the trial court refused to allow the defense to introduce any portion of the absconding witness's interview (see fn. 3, *ante*) solely on the theory that none of Johnson's admissions had not been contrary to his penal interest. If the court's ruling had been based upon its preliminary factual determination of trustworthiness or the exercise of its broad discretion under Evidence Code section 352, it could more readily be sustained. (See *People* v. *Chapman* (1975) 50 Cal.App.3d 872, 879-881 [123 Cal.Rptr. 862].) However, while assuredly not a confession of wrongdoing, certain of Johnson's statements did constitute potentially incriminatory admissions since they placed him at the scene of the killing at the very moment it occurred and in a car similar to the one described by the only prosecution witness.

---

[3] We attach a copy of the official report of Johnson's interview as an appendix.

[4] By way of example the following occurred during the cross-examination of Officer Winston who had interviewed Johnson: "Q By [DEFENSE COUNSEL]: The man that the defendant told you he had loaned his car to that afternoon, you found him, didn't you? [¶] A I had been in contact with his mother who was very cooperative. She had mentioned the fact that this individual had been observed out into the surrounding area. [¶] Q She got the address for you? [¶] A I don't recall if she actually got the address for me or if this individual just came into the office. [¶] Q Do you recall finding out that the defendant's mother had called the station and either talked with you or another office[r] and said Lance is there at his house now? If you get over there, you can get him? [¶] [DEPUTY DISTRICT ATTORNEY]: Objection. That calls for hearsay. [¶] THE COURT: It is sustained. [¶] Q By [DEFENSE COUNSEL]: Do you recall getting the information from the defendant's mother, not only where this man could be questioned, but where and when? That is, he was at a specific location at that time? [¶] [DEPUTY DISTRICT ATTORNEY]: Same objection and irrelevant."

Moreover, as the defense counsel had foreseen and so advised the court, the prosecutor was not content with this success. In both his opening and closing arguments, he urged the jury to conclude that the person to whom defendant claimed to have lent his car was "fictitious." Of course, whether or not the missing Johnson's declarations were true or false, Johnson himself was not "fictitious," his existence having been established beyond dispute.

While we recognize appellant may possibly be guilty, and we understand, appreciate and fully sympathize with the frustrations so frequently experienced in the prosecution of gang-related killings, nevertheless, a conviction obtained in the present manner cannot be sustained.

The judgment is reversed.

Roth, P. J., and Compton, J., concurred.

A petition for a rehearing was denied February 24, 1989, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 18, 1989.

APPENDIX

⑧ UR# 86-1628172
SUBJECT: LANCE MACIEL Johnson I.D.# 108466 TAPE #
DATE & TIME: 2-4-87, 1630 HOURS
LOCATION OF INTERVIEW: 10211 S AVALON ; OSD CRASA OFFICE
INTERVIEWED BY: W WINSTON #22903
PERSONS PRESENT: J. FLORES #21701
SUBJECT'S ADDRESS: 10325 S. CLOVIS AVE PHONE NO. 564-4203
PHYSICAL DESCRIPTION: M/BLK/BLK/BRO/5'9"/160 D.O.B. 4-27-62
BUSINESS ADDRESS: UN-EMPLOYED

STATEMENT: ON THE ABOVE DATE & TIME OFFICERS INTERVIEWED LANCE JOHNSON REGARDING THE MURDER WHICH OCCURRED IN THE REAR ALLEY BEHIND 10512 S. CENTRAL AVENUE. JOHNSON STATED " I BORROWED MY HOMEBOY'S ROD'S CAR TO GO AND BUY SOME WEED. HIS CAR IS A GOLD MONTE CARLO (UNK LIC NUMBER), MY PARTNER SQUEK AND I TURNED S/B ON CENTRAL AVENUE FROM 105TH STREET UPON DOING SO I OBSERVED FOUR MEMBER'S OF THE "FRONT STREET CRIPS" GOING EASTBOUND ACROSS CENTRAL AVENUE FROM 104TH STREET. I OBSERVED THEM WALK TO THE REAR ALLEY BEHIND THE CENTRAL RALPHS SWAP MEET. I HEARD WHAT SOUNDED LIKE SHOOTING COMING FROM THE AREA IN WHICH I SAW THEM GO. I LATER SAW THE SAME GUY'S AT 104TH STREET AND CLOVIS AVENUE I RECOGNIZE THESE GUYS AS BEING "BALD HEAD" "D-DOG", "JOHN BOY", AND BRIAN HOLLOWAY. UPON SEEING THESE GUY'S CROSSING CENTRAL AVENUE I OBSERVED "BALD-HEAD" ARMED WITH A HANDGUN

Lance Johnson