Filed 5/15/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER P. WILSON,<br><br>    Defendant and Appellant. | B234519<br><br>(Los Angeles County<br>Super. Ct. No. NA084316) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard R. Romero, Judge.  Reversed.

Thomas K. Macomber, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Toni R. Johns Estaville, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Christopher P. Wilson appeals from the judgment entered following his conviction by jury of second degree robbery, false imprisonment by violence, and assault with a semiautomatic firearm, with findings that a principal was armed with a firearm, defendant used a firearm, and he committed the crimes with the intent to promote criminal conduct by gang members. (Pen. Code, §§ 211, 236, 245, subd. (b), 12022, subd. (a)(1), 186.22, subd. (b)(1)(C).) Defendant was sentenced to 22 years in prison. He contends the trial court erred by allowing the prosecution to introduce the victim's preliminary hearing testimony and photographs from defendant's cell phone and denying his motion for new trial.[1] We conclude defendant was denied a fair trial and reverse.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

For reasons that will be set forth in detail below, the victim, Lewis Peoples, Jr., did not testify at trial. The prosecution was allowed to use his preliminary hearing testimony.

## I.   The Prosecution Case

Lewis Peoples, Jr., ran an internet-based radio station from his home in Wilmington. He became acquainted with defendant and arranged for him to be interviewed on his station.

At approximately 5:30 p.m. on October 28, 2009, defendant arrived at Peoples's residence in a vehicle with three others. Defendant asked where a gas station was. Peoples told his mother that he was going to direct defendant to a nearby station. The party of five got into the car, with defendant in the front passenger seat and Peoples in the rear passenger seat behind defendant. The group went to a station and gas was put in the car.

---

[1]   He also claims cumulative error requires reversal of the judgment.

[2]   On October 15, 2012, defendant filed a petition for writ of habeas corpus. We deferred consideration of the writ pending our review of this appeal. Given the disposition of the appeal, the petition is dismissed as moot.

The car left the station and did not immediately return to Peoples's home. Peoples protested, claiming that he had to go home to babysit. The others said they were going to take him somewhere. Eventually, they arrived in Long Beach. Defendant asked Peoples what he had in his pockets. Peoples replied it was none of his business. Defendant said, "You think I'm playing around?" Defendant produced a handgun and pointed it at Peoples. The driver asked, "Oh, are we pulling out guns?" and he also brought out a gun. Peoples gave defendant his cell phone and $2.

The car was driven to another location in Long Beach where defendant tried to sell a Gucci bag. There, defendant talked to some individuals, who he referred to as his "Goons." Later, the group stopped in a store parking lot. Defendant told the driver to let Peoples out of the car. Peoples went into the store, asked to use the phone to call the police, and was refused by a clerk. Peoples walked to his grandfather's store where he called 911.

That night, defendant called Peoples and claimed he also had been robbed. Peoples responded, "That's B.S." He had no further contact with defendant.

Peoples said he did not want to testify, but felt compelled because he had been subpoenaed.

King Patterson is Peoples's grandfather. At about 6:15 p.m. on October 28, Peoples arrived at Patterson's place of employment and asked to use Patterson's phone. Peoples called his mother and Patterson heard him say that he had been taken from Wilmington to Long Beach and robbed. Peoples appeared cold and scared. Patterson called the police. A tape of the 911 call was played for the jury.

Christie Patterson is Peoples's mother. In court, she was unable to say whether she saw someone present who was at her residence on October 28. She admitted that she was shown a photographic lineup by a detective and selected a picture of a person. On the statement form she wrote, "No. 4 is the guy that came to my house to do a[n] interview with my son and went to the gas station with." Defendant was the person depicted in that photograph.

3

Her son, Peoples, told Patterson that he had a conversation with Long Beach Police Detective Gregory Krabbe. According to her son, the detective told him that if he did not say the same thing as he had during his preliminary hearing testimony he would be prosecuted for perjury. She acknowledged telling the prosecutor and Detective Krabbe that she was considering taking her son out of the state so he would not have to testify due to her concerns about his safety.

After the October robbery, Patterson continued to question her son about the incident. Over time, she realized that things were not "adding up" to her. Detective Krabbe called and informed her that her son told him that he did not want to testify. The detective told Patterson that he believed Peoples was concerned with being labeled a snitch.

On June 8, 2010, she and her son signed a statement, which read:

"I, Lewis Peoples, Jr. am making this statement regarding the matter of People v. Christopher Wilson of my own volition, and am under no influence that is either improper, undue or both.

"1.    After taking into account all of the factors involved and being fully advised of the possible consequences, my conscience requires that I make the following statement:

"2.    The testimony I provided during the preliminary hearing in the above-referenced matter held on February 3rd, 2010 was factually incorrect."

The statement was prepared by an attorney and presented to Patterson and her son. She believed she was required to sign it because her son was a minor. The statement was received into evidence.

Patterson admitted telling the prosecutor and detective that Peoples was completely consistent when recounting the details of the October incident. She denied that her son had been offered work in the music industry if he did not cooperate with the prosecution. Peoples told her that his father had arranged for an attorney to help them. She did not take her son out of state because the attorney told her to let him take care of it.

4

Long Beach Police Officer Matthew Kennison had a conversation with defendant, during which defendant said he was a member of the Filthy Youngs Crew. The Crew was affiliated with the Baby Insane and Insane Crip gang. Defendant had several tattoos associated with the two gangs.

On December 11, 2009, Officer Luis Ramirez arrested defendant. During the booking process, he recovered a cell phone from defendant's person. According to a gang officer, the photographs on defendant's phone depicted his tattoos and various scenes, all of which demonstrated his membership and allegiance to the gang. In the officer's opinion, the crimes against Peoples were committed with the specific intent to benefit the gang.

Detective Krabbe had several conversations with Christie Patterson, some of which were recorded. She told him that she was thinking of taking her son out of the state so he would not have to testify. She stated she told Peoples's father about her plan and his father told her not to worry because the attorney he had gotten for her would take care of it. The detective asked Patterson about the written statement wherein Peoples noted that his testimony was incorrect. When Krabbe tried to ascertain precisely what part of Peoples's testimony was incorrect, Patterson started to cry and said she was concerned for her son's life if he testified. She told Krabbe that individuals approached her daughter at school and said Peoples was a snitch. Patterson stated that someone offered Peoples work in the music industry if he dropped the case. Krabbe had investigated many gang crimes and believed it was common for a witness to initially cooperate with the prosecution and later attempt to back out due to fear of gang retaliation.

Krabbe asked Peoples how his preliminary hearing testimony was factually incorrect and he did not answer.

## II.    The Defense Case

Thanh Nguyen works at the store that Peoples said he went into after the robbery. On November 9, 2009, a detective came to the store and asked Nguyen whether anyone

5

came in on October 28 and requested to use the phone to call 911. Nguyen told the detective he did not recall anyone doing so.

## DISCUSSION

Defendant's principal complaint lies with the trial court's ruling allowing the prosecution to use Peoples's former testimony at the preliminary hearing. It is necessary to lay out the sequence of events that led to the ruling.

As set forth above, on June 8, 2010, Peoples and his mother signed a document stating that his preliminary hearing testimony was "factually incorrect." After Detective Krabbe received a copy of the statement, he spoke to Peoples and his mother to ascertain why the document was signed and what specific testimony Peoples was referring to. Krabbe learned that Patterson was concerned for her son's safety, certain threats had been made in relation to his testimony, and an attorney had been hired to do what he could to prevent Peoples from testifying. Krabbe did not discover which of Peoples's prior statements were incorrect.

On February 7, 2011, the matter was called for trial. The parties discussed the June 8 statement. The prosecutor explained he was contacted by an attorney who said that he represented Peoples and his mother and that Peoples did not want to testify. The prosecutor opined the statement was drafted because the family was concerned that Peoples would be in danger if he took the stand. For that reason, the prosecutor did not believe Peoples had testified falsely at the preliminary hearing and was ready to proceed. Peoples was brought into the courtroom. Under questioning from the court, Peoples acknowledged that he had an attorney, but he did not know where the attorney was. The court explained to Peoples that he was a witness and asked him whether he had any reason to believe that he would not answer questions. He replied, "No, there's not." The noon recess was taken.

At the afternoon session, Peoples's attorney was present. He informed the court that because portions of Peoples's preliminary hearing testimony were "not true," his

6

anticipated testimony would conflict and there would be "issues." The attorney stated, "So at this point, he intends to take the Fifth on the questions asked to him regarding his preliminary hearing testimony and the incident that is the subject of the prosecution here."

The prosecutor repeated that he believed Peoples's belated claim concerning his preliminary hearing testimony was nothing more than an attempt to avoid cooperating with the prosecution out of concern for his safety. He stated the Fifth Amendment issue was being used in a "fraudulent manner" to keep Peoples off the stand and asked the court to inquire further.

After the court expressed doubt that Peoples had a basis to claim privilege under the Fifth Amendment, it asked whether his counsel wanted to make a further showing in chambers.[3] Counsel agreed to do so.

Once in chambers, the court asked counsel how Peoples would incriminate himself. Initially, counsel said it was his understanding—because he had not gone over the matter with Peoples extensively—that defendant's attorney had interviewed someone who was in the car at the time of the alleged robbery. This witness stated that no crime was committed in the car. The court asked counsel if he had spoken directly to Peoples and counsel replied, "I have not gone through all of the story, no, I have not." However, counsel told the court that based on what Peoples told him he believed there was no robbery and no gun. Finally, the court asked counsel directly whether Peoples specifically said there was no gun. Counsel replied yes. The court asked if Peoples said there was no robbery, Again, counsel answered yes. The transcript was ordered sealed.

In open court, the court told the parties, "I am trying to choose my words carefully because I don't want to make inappropriate disclosures, but it appears to me that if

---

[3]    We see no reason for the court to have gone into chambers to discuss the matter alone with counsel. If the purpose was to protect the attorney-client privilege, the presence of Peoples, the holder of the privilege, was necessary. More importantly, if the matter had been discussed in open court, the parties would have become aware that Peoples was now denying a robbery had occurred. The ensuing flawed trial could have been avoided.

Mr. Peoples were to testify, he wouldn't testify truthfully, he would be opening himself up to prosecution for perjury on substantial issues, not minor details. . . . It doesn't seem that I can force somebody to take the stand when they tell one thing at a preliminary hearing and are now telling something else. I would be inclined to think they do have a valid privilege." The court did not disclose that, according to his counsel, Peoples was now denying that he had been robbed. Nor did it suggest that the prosecutor interview Peoples to ascertain what part of his preliminary hearing testimony was not true.

Peoples was called to the stand and sworn. The prosecutor asked, "Mr. Peoples, you've been promised help with your career related to the music industry if you assist the defense by avoiding testifying in this case; isn't that right?" After Peoples responded that he refused to answer and invoked his Fifth Amendment to remain silent, the prosecutor asked, "You told your mother that cooperating with the prosecution in this case would get you killed; isn't that right?" Peoples gave the same reply. After ascertaining that he would give the same answer to every question he was asked, the court found Peoples had properly invoked his right against self incrimination and deemed him unavailable. As noted, the prosecution was allowed to have Peoples's preliminary hearing testimony read into the record.

Defendant argues the court knowingly allowed testimony it knew to be false to be used at trial. He urges the court compounded the error by not disclosing to the parties that Peoples had recanted his claim that defendant robbed him. As a result, he contends he was denied a fair trial. The Attorney General does not answer defendant's charge directly, choosing to focus on a party's right to use the former testimony of an unavailable witness. We conclude defendant has the better argument.

The case cited by the Attorney General, *People v. Maxwell* (1979) 94 Cal.App.3d 562, is readily distinguishable. In that matter, after answering some of the prosecutor's questions, the alleged victim of domestic violence and kidnapping refused to testify further. She stated under oath that the basis for her asserting the privilege against self-incrimination was that her answers at trial might subject her to possible charges of perjury because her preliminary hearing testimony could be deemed untruthful. (*Id.* at

8

pp. 567-568.) The witness was declared unavailable and her preliminary hearing testimony was admitted. The trial court found the defendant guilty of the lesser included offense of false imprisonment. The conviction was affirmed on appeal. The appellate panel concluded that the trier of fact could rely on certain portions of the victim's preliminary hearing testimony, as it had not been established that her prior testimony was false in its entirety. Here, the issue is not one concerning the sufficiency of the evidence.

Although the facts in the case cited by defendant, *People v. Garner* (1989) 207 Cal.App.3d 935 (*Garner*), do not mirror those in the trial under review, the underlying principles in that case are instructive here. In *Garner*, the sole prosecution witness, Phillips, testified at the preliminary hearing that the defendant shot the victim. "At trial, however, it was stipulated in open court that Phillips told the deputy district attorney in charge of this prosecution, 'that at the preliminary hearing he did make a positive identification of the defendant, but that he was lying when he did so.'" (*Id.* at p. 938, fn. 1.) Phillips refused to testify, asserting that to do so would allow the prosecution to prosecute him for perjury. He was declared unavailable and his preliminary hearing testimony was admitted. The jury returned a guilty verdict. The *Garner* court reversed, explaining that "[w]hen the People wish to go forward in reliance upon the testimony of a recanting witness, fundamental fairness would require, at a minimum, that the jury (1) be advised precisely why the witness is being allowed to refuse to testify, i.e., an alleged fear of a perjury prosecution, and (2) be instructed that they should draw all reasonable and appropriate inferences therefrom concerning the witness's credibility and the guilt or innocence of the accused." (*Id.* at p. 941.)

We acknowledge that the present case differs from *Garner* in certain respects. Here, at the time of trial, there was no evidence presented that Peoples lied at the preliminary hearing when he testified that defendant robbed him at gunpoint.[4] Instead, we have an unsworn statement to that effect by an attorney, whose role in this case is far

---

[4]   In support of defendant's motion for new trial, Peoples signed a letter, declaring under penalty of perjury "that the crime [he] reported in 2009 against Christopher Wilson was not true."

9

from clear.[5]  In chambers, out of the presence of the parties and the witness, counsel informed the court that Peoples said he had not been robbed and no gun was present at the scene of the incident.  As a result, the prosecutor was not informed that Peoples said he had lied when he testified that he had been robbed.  Thus, the prosecutor did not proceed in reliance upon testimony he knew had been recanted.  As we will explain, the prosecutor's lack of knowledge with respect to his witness's recantation should not lead to a different result than that reached by the *Garner* court.

We conclude that upon being informed that Peoples had recanted his preliminary hearing testimony, the court had an obligation to inform the parties of the situation.  If the prosecutor had been advised that his only witness to the robbery was now saying the crime did not occur, the prosecutor might have determined that there was a reasonable doubt as to defendant's guilt and dismissed the case.  Or, if he still believed that Peoples's preliminary hearing testimony was truthful, he could have offered Peoples immunity, thereby negating a self-incrimination claim.  If the trial had continued, Peoples would have been cross-examined regarding his recanting of his prior testimony and the jury properly would have been called upon to decide which version to credit.

Instead, as the trial unfolded, the prosecutor presented a great deal of testimony showing that Peoples and his mother feared gang retaliation if he testified.  That, the prosecutor urged in argument, was the reason Peoples did not want to testify and

_____

[5]  There was substantial evidence that counsel was hired in an effort to keep Peoples from testifying due to the fear of retaliation.  Christie Patterson told Detective Krabbe that fear for her son's safety led her to consider moving him out of state.  She admitted at trial that she chose not to when she was informed that her attorney would take care of the problem.  The idea that Peoples would commit perjury by testifying in a manner consistent with his preliminary hearing testimony was never raised prior to trial.  Far from it.  In a recorded conversation with Detective Krabbe, Patterson said that the statement she and her son signed meant that "the little things were incorrect," not that the incident did not occur.  She said that on several occasions Peoples told her the "incident happened."  Patterson also told the detective that her son was completely consistent when recounting the events of the October 28 robbery.  All of this inspires little confidence in a conclusion that the fear of being prosecuted for committing perjury was the reason behind Peoples's reluctance to testify.

10

suggested that an attorney had been hired to put together a vague statement in order to give Peoples an out.  More significantly, by allowing the trial to continue under the false premise that merely some details of Peoples's preliminary hearing testimony were "factually incorrect," the court enabled the prosecutor to unwittingly (and obviously convincingly) argue to the jury that Peoples's written statement meant only that his prior testimony suffered from minor inconsistencies.  For example, the prosecutor pointed out that in his testimony Peoples said he called 911.  The tape of the 911 call demonstrated that Peoples's grandfather was the caller.  The prosecutor argued, "So his statement was factually incorrect.  Was it a lie?  That's a different question."

The point is that was the very question the jury should have answered, but it was not given the opportunity.  The jury never considered Peoples's preliminary hearing testimony in light of his current claim to his counsel that it was a lie.  It cannot be doubted that there is a fundamental difference between knowingly committing perjury and proffering testimony that is incorrect in some unspecified detail.  Nor can one deny that the veracity of an admitted liar is subject to more scrutiny than the truthfulness of a witness who is simply mistaken in certain particulars.

Our case bears enough similarities to *Garner* that we find its principles should apply here.  Although, unlike *Garner*, the prosecutor did not utilize preliminary hearing testimony he knew had been repudiated, the court allowed the only testimony demonstrating defendant's guilt despite accepting counsel's representation that the witness had since disavowed it.  This allowed the prosecutor to convince the jury, as Peoples's mother told Detective Krabbe, that Peoples's statement regarding his preliminary hearing testimony meant only that "the little things were incorrect."  In light of the court's understanding that the prosecutor's theory simply was not true, defendant's trial was fundamentally unfair.  Because the jury was allowed to view the evidence in a false light, justice demands that defendant receive a new trial.

11

**DISPOSITION**

The judgment is reversed.

**CERTIFIED FOR PUBLICATION**

                                        SUZUKAWA, J.

We concur:


WILLHITE, Acting P. J.


MANELLA, J.

12