Filed 11/24/14  P. v. Carrillo CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JORGE OMAR CARRILLO,<br><br>    Defendant and Appellant. | B250485<br><br>(Los Angeles County<br>Super. Ct. No. KA098896) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gilbert M. Lopez, Judge.  Reversed.

Doreen B. Boxer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Jonathan J. Kline and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Jorge Omar Carrillo appeals from the judgment entered following his conviction by jury of battery of a spouse and attempted criminal threats, with a finding that he personally used a handgun during commission of the latter offense. (Pen. Code §§ 243, subd. (e)(1), 422, subd. (a), 664 , subd. (a), 12022.5, subd. (a).[1]) Defendant was sentenced to five years in prison and ordered to pay various fines and fees. He contends the trial court erred by (1) admitting the victim's preliminary hearing testimony and striking her recanting trial testimony after she invoked her privilege against self-incrimination and refused to complete her testimony at trial, while rejecting defendant's request to submit evidence to impeach the victim's prior testimony; and (2) failing to adequately instruct the jury on the issue of the stricken testimony and the reasons why the victim was not testifying. We conclude defendant was prejudiced by the error and therefore reverse.

## FACTUAL AND PROCEDURAL HISTORY

Defendant was charged with corporal injury to a spouse (count one), criminal threats (count two), and dissuading a witness from reporting a crime (count three), with the additional allegation as to counts two and three that defendant personally used a handgun during the commission of the offenses. The jury trial commenced on April 19, 2013.

*A. Prosecution's Case*

<u>Yvonne Mora</u>

The prosecution's principal witness at trial was the victim, Yvonne Mora. However, as detailed further below, both on direct and on cross-examination, Ms. Mora gave testimony that contradicted statements she previously had made at the preliminary hearing regarding facts central to the case. She also testified that she "exaggerated" and

---

[1]     All subsequent statutory references are to the Penal Code unless otherwise indicated.

made untrue statements at the preliminary hearing. As a result, midway through defendant's recross-examination the trial court appointed counsel for Ms. Mora, following which she invoked her Fifth Amendment privilege against self-incrimination and refused to testify further. The court then declared Ms. Mora, unavailable, struck her trial testimony, and granted the prosecution's request to admit her prior preliminary hearing testimony. That testimony was read into the record and made up the bulk of the prosecution's evidence at trial. Ms. Mora testified at the preliminary hearing to the following facts:

On July 31, 2012, she received several text messages from defendant, her estranged husband, who was at her home watching two of their children. In the messages defendant indicated he had found a picture of Ms. Mora with another man and told her she was no longer allowed in the house and that he would throw her belongings into the yard. Ms. Mora told defendant she was on her way home.

Ms. Mora said that when she arrived home she checked to see that the children were in their rooms because she "kn[ew] something was going to happen." She went to her room and tried to close the door, but defendant came in and started yelling about the picture he had found. To defuse the situation, Ms. Mora suggested they go to bed. As she was lying down in bed, she felt a "pull" on her right arm. Defendant pulled her arm, causing her to fall to the ground and break her fingernail. Defendant then grabbed her left arm and twisted it over the dresser, while Ms. Mora tried to pull away and told him he was going to break her arm. Defendant also kept yelling at her to get out of the house.

Ms. Mora was able to pull away, then sat down on the bed and could see the "marks" on her arm. She told defendant "this is the last time you put your arms on me. I'm done. It's over. You're going to pay for this. I'm going to call the cops." She started to dial her cell phone, but defendant said "no, you're not," and she saw him pull out a gun from between the wall and the corner of the bed. She had seen this gun before and recognized it as defendant's semiautomatic gun. Defendant pulled the gun out from a metal lockbox and started putting bullets in the clip. Defendant then told her "you're

3

not going to call the cops. If you call the cops, there's going to be all kinds of shooting right now." He then placed the clip in the gun and pointed it at Ms. Mora. In total he pointed it at her two times that night.

Ms. Mora put her phone down and tried to talk to defendant, asking him what his plans were. Defendant stated "'you'll see what's going to happen'" and walked out of the bedroom. Ms. Mora went to find her children and told her older son to get his cell phone and headphones. She then returned to her room and texted her son to "put on your headphones and duck. Your dad has a gun." Defendant followed Ms. Mora back into the bedroom and prevented her from using her phone. When Ms. Mora tried to make light of the situation and told defendant she would post a comment on Facebook, defendant responded that would be the last thing she would post.

Once defendant left the bedroom, Ms. Mora sent a group text message to all of her contacts in her phone as a "call for help" because "[t]here was going to be shootings." She texted "help. My arm hurt. I'm injured . . . I can't call the cops." Her friend Marlene Alvarado responded by text that the police were on their way. Ms. Mora and Ms. Alvarado then exchanged a series of text messages regarding where defendant and the children were and details about the house. Ms. Mora unsuccessfully searched for defendant and her car keys, and then locked the doors to the house. Defendant knocked on the door and told her to open it, but she refused. Defendant then re-entered the home through a bedroom window and "cornered" Ms. Mora with the gun in his hand, saying "do something stupid again, and you'll see what is going to happen to you. . . ."

By the time police arrived, Ms. Mora had returned to her bedroom. Defendant came into the room holding the gun and asked her whether she had called the police; she denied doing so, stating that the neighbors might have called after seeing him enter the house through the window. Ms. Mora suggested that defendant go outside and tell the police that he had locked himself out and that she would back up his story. Defendant went outside and began speaking to the police. Ms. Mora did not see what he did with the gun.

4

*Lluvia "Marlene" Alvarado*

Ms. Alvarado, known as "Marlene," testified that she has known Ms. Mora and defendant for six years and is a close friend of Ms. Mora. On July 31, 2012, after midnight, she received a series of text messages from Ms. Mora that led her to believe that defendant was going to hurt himself, the children and Ms. Mora. Ms. Alvarado called 9-1-1 and reported that Ms. Mora told her defendant had a gun and said if she called the police he would "'point or shoot.'" The substance of Ms. Mora's text messages was relayed by Ms. Alvarado to the 9-1-1 operator and admitted into evidence at trial through a transcript and audio recording of the 9-1-1 call.

*Deputy Sheriff Wong*

Los Angeles County Deputy Sheriff Amy Wong testified that she responded to the 9-1-1 call on July 31, 2012, to Ms. Mora's residence. Deputy Wong recovered a gun inside an unlocked metal box in a linen closet in the home. There was a loaded magazine in the box.

Deputy Wong spoke with defendant that night, after he waived his *Miranda*[2] rights. According to defendant, he came to the house to drop off his son and became upset when he found a picture of his wife with another man. She came home and they began to argue. He attempted to grab a purse from Ms. Mora, the two struggled over the purse, and the purse strap got caught on her left arm, possibly causing her injuries. Defendant told Deputy Wong that he then took the gun box out from under the bed, unlocked it, took the gun out, "checked it to make sure it was unloaded and put it in a safe location." Defendant told Deputy Wong that he hid the gun in the closet.

Deputy Wong also spoke with Ms. Mora that night and observed that she had injuries. Ms. Mora was very upset, had been crying, and "kept holding her left arm because of the injury." Ms. Mora did not mention a purse to Deputy Wong. Instead, she said that defendant grabbed her arm.

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436.

5

*B. Ms. Mora's Contradictory Trial Testimony*

As noted above, during her testimony at trial, Ms. Mora offered a number of statements that contradicted her preliminary hearing testimony, ultimately leading to the striking of her trial testimony and the admission of her preliminary hearing testimony. For example, during direct examination at trial, Ms. Mora testified that she sustained her injuries when she and defendant were tugging a purse back and forth on her arm. She also stated that she did not see defendant remove the gun from the lockbox in the bedroom, because his back was to her and she just heard "this clinking" noise. When defendant turned toward her, she saw that he was holding a "metal thing" in his hand, which she "believed" was his gun. She could not see clearly what he had in his hand and then testified that she "never saw the gun." She denied telling Deputy Wong that she saw defendant place the magazine inside the gun, testifying instead that she heard noises that sounded like defendant was trying to load the gun, but his back was to her. Ms. Mora also denied telling the police that she thought defendant was going to shoot her. She testified that she texted her friend, Ms. Alvarado, that defendant had a gun because she wanted Ms. Alvarado to call the police so that her children would not blame her for doing so.

On cross-examination, Ms. Mora testified unequivocally that she did not think defendant was going to shoot her that day. When asked whether she presently believed that defendant was loading bullets into the gun, she stated:

> "A: No.
> "Q: That's a different story than what you testified at the preliminary hearing and also what you told the police officers, is that correct?
> "A: Correct. . . .
> "Q: When you testified at the preliminary hearing when you promised to tell the truth . . . and you testified that . . . he was

6

putting bullets into that clip, that was not a truthful statement,

was it?. . . .

"A:  It wasn't."

She also was asked about her prior testimony that defendant "was waving the gun around, [saying] there's going to be a lot of shooting going on if you call the cops."  She denied that defendant made those statements "like that."

On redirect, Ms. Mora stated that she texted Ms. Alvardo not because she wanted her to call the police, but because she "wanted her to come and talk" to defendant to help calm him down.  Then, on recross-examination, she admitted that "maybe [she] exaggerated or added" and did not tell the whole truth at the preliminary hearing.  She again stated that defendant did not have a gun in his hand that night.

*C.  Assertion of Fifth Amendment Privilege*

At that point, the court called counsel into chambers.  The court indicated that, given the questions to Ms. Mora "that could tend to incriminate the witness if, in fact, she admitted to or indicated that she had committed perjury or was now changing her story," Ms. Mora might need to have an attorney appointed for her.  The court on its own motion then appointed counsel for Ms. Mora.

Upon resumption of recross-examination (held outside the presence of the jury for the purpose of assessing the self-incrimination issue), defendant's counsel asked Ms. Mora whether she previously testified at trial that she did not see defendant handle a gun on the day of the incident.  After conferring with her counsel, Ms. Mora refused to testify further and invoked her Fifth Amendment privilege against self-incrimination. Defendant then moved for a mistrial, based on the fact that he was unable to complete his recross-examination of Ms. Mora.  The prosecution moved to have Ms. Mora declared unavailable, have her trial testimony stricken, and her preliminary hearing testimony admitted.  The court denied defendant's motion for mistrial and found Ms. Mora unavailable pursuant to Evidence Code, section 240, based on her assertion of her privilege against self-incrimination.  The court further granted the prosecution's motion

7

to strike Ms. Mora's trial testimony. The court then granted the prosecution's request to admit Ms. Mora's preliminary testimony.

Immediately following the striking of Ms. Mora's testimony, the court advised the jury as follows: "I'm striking the testimony of Ms. Mora. [¶] That means you didn't hear it. We have it transcribed, but you're not going to get it if you ask for it. That means the direct examination of Mr. Higgins, the cross-examination of Mr. Gibbons, the redirect of Mr. Higgins and the partial . . . recross by Mr. Gibbons will not be afforded to you. So consider you didn't hear that testimony. [¶] And there's legal reasons for that. I can't explain them to you. You're just going to have to rest assured that that's - - we're going to go forward, and you're not going to consider that testimony." Ms. Mora's preliminary hearing testimony (as detailed above) was then read into the record in front of the jury.

Both sides rested on April 25, 2013. The following day, defendant requested to reopen testimony to put on a private investigator who would testify to statements Ms. Mora made following the preliminary hearing that were inconsistent with her preliminary hearing testimony, regarding whether she saw defendant with the gun. The court stated it would consider defendant's request, but never expressly ruled on it, and then proceeded as if it had been denied.

*D. Instructions to the Jury*

In addition to the admonition given during trial, the court again admonished the jury during the reading of the jury instructions that "[i]f I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose. And I–I did strike testimony from the record of a witness, and so all of it was stricken."

But the court also instructed the jury using a modified version of CALCRIM 303:

"During the trial, the Court struck all of the trial testimony of
Yvonne Mora. You are not to speculate as to the reason why this
was done. Although that testimony was stricken, you may, but are
not required to, consider that stricken testimony for the limited

8

purpose of assessing the credibility and weight to be given to Yvonne Mora's preliminary hearing testimony that was read into evidence. [¶] You may not consider Yvonne Mora's stricken trial testimony for any other purpose. [¶] You may also consider Yvonne Mora's behavior and demeanor in court when determining what weight to give her preliminary hearing testimony."

*E. Verdict and Appeal*

On April 29, 2013, the jury found defendant guilty of (1) battery upon a spouse, a necessarily lesser included misdemeanor offense of count one; (2) attempted criminal threats, a necessarily lesser included felony offense of count two; and (3) personal use of a firearm during commission of the latter offense. The jury found defendant not guilty on count three, dissuading a witness. Defendant's motion for a new trial was denied on May 31, 2013. Defendant timely appealed the resulting judgment.

## DISCUSSION

*A. The Trial Court Erred in Excluding Impeachment Evidence and in Giving Conflicting Jury Instructions*

Defendant contends that he was denied a fair trial because of the combined effect of the trial court's rulings regarding Ms. Mora's recanted testimony. Ms. Mora was deemed unavailable as a witness and her trial testimony stricken. When the court thereafter denied defendant's request to introduce evidence to impeach Ms. Mora's preliminary hearing testimony, defendant was left without any means to put before the jury the fact that Ms. Mora had recanted key portions of her prior testimony. Defendant claims the court compounded this error by failing to tell the jury why Ms. Mora's trial testimony was stricken and by instructing the jury, first, that it could not consider the stricken testimony for any purpose and, then, that it could be considered for the limited purpose of assessing the credibility of her preliminary hearing testimony. The Attorney General does not squarely address defendant's claim, instead focusing on the fact that Ms. Mora's preliminary hearing testimony was admissible as the former testimony of an

9

unavailable witness.  We conclude that the trial court erred by excluding defendant's proffered impeachment evidence and by failing to clearly instruct the jury as to how to properly consider Ms. Mora's trial testimony and subsequent invocation of the Fifth Amendment privilege.

As an initial matter, neither party challenges the trial court's foundational decisions regarding Ms. Mora's invocation of her Fifth Amendment privilege.  The trial court appropriately sustained Ms. Mora's assertion of her right against self-incrimination, based upon her trial testimony recanting crucial aspects of her preliminary hearing testimony—including whether defendant grabbed and injured her arm, whether she saw defendant holding and loading a gun, and whether she was truthful in her text messages to Ms. Alvarado.  Moreover, Ms. Mora testified at trial that she made untrue statements during her preliminary hearing testimony.  She was therefore "entitled to invoke this privilege and refuse to answer questions which might expose [her] to a prosecution for perjury by furnishing a link in the chain of evidence tending to establish guilt of that offense."  (*People v. Maxwell* (1979) 94 Cal.App.3d 562, 570 (*Maxwell*) [citing *People v. Lawrence* (1959) 168 Cal.App.2d 510, 516-517].)

Consequently, the trial court also acted properly in finding Ms. Mora unavailable as a witness based on her invocation of her Fifth Amendment privilege (Evid. Code, § 240, subd. (a)(1)), and in striking her trial testimony, given that defendant was unable to complete his recross-examination once she refused to testify.  As defendant argued in his motion for mistrial, use of Ms. Mora's trial testimony would have violated his constitutional right of confrontation.  (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15.)[3]

---

[3]     Defense counsel asserted during oral argument that the jury should have been allowed to consider Ms. Mora's trial testimony for impeachment purposes, and, therefore, the testimony should not have been stricken for all purposes.  However, defendant does not challenge the exclusion of Ms. Mora's trial testimony as substantive evidence following her invocation of her Fifth Amendment privilege, given defendant's constitutional confrontation rights.

Defendant also does not dispute the court's finding that Ms. Mora's preliminary hearing testimony was admissible under the former testimony exception to the hearsay rule, since (1) she was unavailable as a witness; and (2) defendant had the "right and opportunity" to cross-examine Ms. Mora at the preliminary hearing with "an interest and motive similar to that" which he had at trial. (Evid. Code, § 1291). Rather, defendant contends that, once the court admitted Ms. Mora's preliminary hearing testimony and struck her trial testimony, it was required to take additional steps to protect defendant's right *to due process* by providing some means for the jury to consider the fact that Ms. Mora had recanted the bulk of her prior testimony.

California courts considering this issue have previously held on several occasions that considerations of justice and fairness require that the prosecution's use of a recanting witness's prior testimony be contingent on some counterbalancing measures. In *People v. Collup* (1946) 27 Cal.2d 829 (*Collup*), the trial court admitted the preliminary hearing testimony of a key witness who was unavailable for trial. The California Supreme Court held that contradictory statements made by the witness after the preliminary hearing were admissible for impeachment (a result later codified in Evidence Code, section 1202), reasoning that otherwise the defendant would be "helpless in meeting the testimony by a method which may refute it entirely or cast serious doubts upon its veracity, namely, subsequent contradictory statements or admissions by the witness that the testimony was false." (*Id*. at p. 836.) As a result, "justice and fairness compel" either the exclusion of the prior testimony or the admission of the impeachment evidence. (*Ibid*.)

In *People v. Garner* (1989) 207 Cal.App.3d 935, 938 (*Garner*), a witness's preliminary hearing testimony constituted "the only evidence connecting appellant to the crime." The trial court admitted the prior testimony after the witness asserted his Fifth Amendment privilege and refused to testify at trial on self-incrimination grounds. (*Ibid*.) The court further barred cross-examination as to the witness's reasons for refusing to testify and instructed the jury, pursuant to CALJIC 2.25, that "'[w]hen a witness refuses to testify as to any matter, [based on] the constitutional privilege against self-

11

incrimination, you are not to draw from that fact any inference as to the credibility of the witness, or as to the guilt or innocence of the defendant.'" (*Id*. at p. 938.) The Court of Appeal reversed, holding that not only was CALJIC 2.25 unwarranted in the "unique context" of a witness refusing to testify on perjury grounds, but, to the contrary, "it is eminently reasonable and proper for the jury to draw an unfavorable inference therefrom regarding [the witness's] credibility." (*Id*. at p. 938-939.)

Ultimately, the *Garner* court held that because the witness's admission that he had lied at the preliminary hearing occurred after the hearing had concluded, the defendant was "completely precluded from questioning his sole accuser concerning a primary issue, i.e., the witness's admission of false swearing," which resulted in a denial of both defendant's "constitutional right to confront his accuser and to conduct a meaningful cross-examination. These deprivations, particularly when combined with the court's repeated CALJIC No. 2.25 admonitions, effectively precluded the jury from determining when, if ever, the one witness against him was speaking truthfully." (*Id*. at p. 940-941.) As a result, "[w]hen the People wish to go forward in reliance upon the testimony of a recanting witness, fundamental fairness would require, at a minimum, that the jury (1) be advised precisely why the witness is being allowed to refuse to testify, i.e., an alleged fear of a perjury prosecution, and (2) be instructed that they should draw all reasonable and appropriate inferences therefrom concerning the witness's credibility and the guilt or innocence of the accused." (*Id*. at p. 941.)

Similarly, in a recent decision, *People v. Wilson* (2013) 216 Cal.App.4th 342 (*Wilson*), this division reversed a conviction because the trial court failed to disclose to the parties the fact that a key witness had recanted his preliminary hearing testimony. Without this information, the prosecution proceeded on the theory that the witness was invoking his Fifth Amendment privilege because he was concerned for his safety if he testified. (*Id*. at p. 348.) The witness was declared unavailable and his preliminary hearing testimony admitted. (*Id*. at p. 349.) Citing *Garner*, this court held that the trial court's failure to inform the parties that the witness had recanted denied the defendant a

12

fair trial, as the jury should have been able to consider the witness's prior testimony "in light of his current claim to his counsel that it was a lie." (*Id*. at p. 351.) Instead, the jury "was allowed to view the evidence in a false light," thus compelling reversal. (*Ibid*.)

Those cases are instructive. Here, the primary evidence that defendant grabbed Ms. Mora and threatened her with a loaded gun came from Ms. Mora's preliminary hearing testimony, which was introduced at the prosecution's request. But the jury was not allowed to weigh and consider evidence that impeached the preliminary hearing testimony or the fact that Ms. Mora refused to complete her trial testimony after invoking the Fifth Amendment privilege. Instead, the jury was instructed to completely disregard Ms. Mora's inconsistent statements made at trial and was never told why Ms. Mora became unavailable as a witness.

In particular, we conclude that the trial court erred in excluding testimony from defendant's investigator, which would have impeached Ms. Mora's preliminary hearing testimony regarding whether she saw defendant with the gun. According to defense counsel's proffer at trial, the private investigator had interviewed Ms. Mora earlier that week (thus, after the preliminary hearing) and would testify that Ms. Mora told her that defendant did not point a gun at her and that Ms. Mora never saw defendant with the gun on the night in question. Defendant argued at trial that this evidence was admissible under Evidence Code, section 1202, which allows "[e]vidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence" to be admitted "for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct." Notably, the Attorney General did not address the exclusion of defendant's witness in her brief on appeal, but conceded during oral argument that the exclusion was error. We agree. The testimony of defendant's investigator was admissible as it related an inconsistent statement under section 1202 to impeach Ms. Mora's preliminary hearing testimony: the trial court erred in excluding it. (See Evid. Code, section 1202; *Collup*, *supra*, 27 Cal.2d at p. 836.) As a

13

result of the trial court's rulings, defendant had no way to rebut Ms. Mora's admittedly recanted prior testimony.

The Attorney General seeks to distinguish *Wilson*, noting that here the jury did hear Ms. Mora recant during her testimony at trial. But that testimony was stricken and the jurors were repeatedly instructed to disregard it and treat it as if they "didn't hear it." Moreover, although the trial court later attempted to cure these issues by instructing the jury that it could consider Ms. Mora's stricken testimony "for the limited purpose of assessing the credibility and weight" to be given to her preliminary hearing testimony, that instruction was in direct conflict with its preceding instructions not to consider the trial testimony for any purpose and as a result was too confusing to mitigate the errors discussed here. The conflicting instructions as to whether and how the jury could consider the recanting testimony, coupled with the failure to advise the jury why Ms. Mora was refusing to testify, allowed the jury to view the evidence in a false light.

The Attorney General also relies on the decision in *Maxwell* to argue that the unconditional admission of Ms. Mora's prior testimony was proper. However, while the court in *Maxwell* reached the opposite result, the reasoning ultimately supports defendant here. In *Maxwell*, the defendant was convicted following a court trial based primarily on the victim's preliminary hearing testimony. (*Maxwell*, *supra*, 94 Cal.App.3d at p. 566.) That prior testimony was admitted after the victim testified at trial that she "was presently in love with defendant" and refused to testify further, invoking her Fifth Amendment privilege. (*Ibid*.) The Court of Appeal held that the admission of the preliminary hearing testimony was proper, based on the witness's unavailability and the defendant's extensive cross-examination of her during the preliminary hearing. (*Id*. at pp. 569-574.) The defendant also argued that, even if admissible, the preliminary hearing testimony was unreliable due to the witness's assertion of the Fifth Amendment privilege on perjury grounds and it therefore could not serve as an adequate basis for his conviction. (*Id*. at p. 574.) The court disagreed, reasoning that the trial court, sitting as trier of fact, was free to "accept one portion of a witness's testimony while rejecting another. [Citation.]" (*Id*.

14

at 574-575.)  Crucially, it was for the trier of fact to weigh all of the evidence, including the admitted contradictions, and "determine whether [the witness's] prior or her present testimony was truthful and to what extent she lied."  (*Id.* at pp. 576-577, 578, fn.11.) Thus, the court expressly reserved the right to consider the fact that the witness had invoked the Fifth Amendment privilege based on a claim of potential perjury in determining what testimony to believe.  Here, on the other hand, the jury was not able to weigh all of Ms. Mora's contradictory testimony, or even consider the fact that she refused to testify on perjury grounds, in order to determine which, if any, of her statements were credible.  And the jury was further constrained by the contradictory and confusing instructions provided by the court.[4]

Finally, the Attorney General contends that *Garner* was wrongly decided and that it would be improper, pursuant to Evidence Code, section 913, for a trial court to instruct a jury to draw any inferences from a witness's invocation of the Fifth Amendment privilege.[5]  We disagree.  As the comments to section 913 make clear, the principal focus of that section is to protect a litigant's constitutional privilege against self-incrimination. (Evid. Code, § 913, Comments ["If comment could be made on the exercise of a privilege and adverse inferences drawn therefrom, a litigant would be under great pressure to forgo his claim of privilege and the protection sought to be afforded by the privilege would be largely negated."].)  *Garner* expressly fashioned a narrow exception in the limited circumstances where "(1) the witness's invocation of the privilege is based upon a claimed fear of a perjury prosecution, and (2) it is the People who wish to use this witness's earlier, and assertedly false, testimony as evidence against the accused."

---

[4]     Such instructions were not an issue in *Maxwell*, as the case was tried to the bench.

[5]     Section 913, on which CALCRIM 320 is based, provides that the trier of fact may not draw any inference from a witness's assertion of the privilege not to testify "as to the credibility of the witness or as to any matter at issue in the proceeding."

*Garner*, *supra*, 207 Cal.App.3d at p. 942.[6] Neither of cases cited by the Attorney General deal with the circumstance of a non-litigant witness's invocation based on a fear of prosecution for a testimonial crime. (See *Griffin v. California* (1965) 380 U.S. 609, 615 [forbidding comment on the accused's silence]; *People v. Bernal* (1967) 254 Cal.App.2d 283 [witness refuses to testify for fear of prosecution in nontestimonial crime].) The "unique" exception carved out in *Garner* reflects the potential tension between protecting a defendant's due process rights and a witness's right to avoid self-incrimination and resolves it largely by mitigating any possible harm to the latter. We see no reason to conclude otherwise.

Accordingly, we conclude that the trial court committed error in excluding impeachment evidence regarding Ms. Mora's recanted testimony and in failing to properly instruct the jury on that issue.

*B. The Trial Court's Errors Were Prejudicial To Defendant*

The Attorney General contends that any error was harmless, as there was sufficient evidence introduced at trial outside of Ms. Mora's testimony to uphold defendant's conviction. We find that the trial court's errors in excluding defendant's requested impeachment evidence and in failing to properly instruct the jury regarding Ms. Mora's testimony require reversal, as it appears "reasonably probable" defendant would have obtained a more favorable result had those errors not occurred. (*People v. Watson* (1956) 46 Cal.2d 818, 836). A reasonable probability under this standard "does not mean

---

[6] Of course, if the prosecution wishes to avoid the potential negative inferences the jury may draw from a witness's invocation of the Fifth Amendment privilege on perjury grounds, it may grant the witness immunity from prosecution, thus removing self-incrimination as an issue. (See *Garner*, *supra*, 207 Cal.App.3d at p. 941 [describing immunity as the "truly preferable approach" as it would allow the jury to hear "each of [the witness's] conflicting tales fully and fairly tested by each [party's] cross-examination, before they were called upon to determine which version to credit"]; *Wilson*, *supra*, 216 Cal.App.4th at p. 351.) The prosecution here considered and rejected this option.

more likely than not, but merely *a reasonable chance*, more than an *abstract possibility*." (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 [citing *Watson*, *supra*, 46 Cal.2d at p. 837; see also *Strickland v. Washington* (1984) 466 U.S. 668, 693-694, 697, 698].)

The Attorney General relies on the text messages sent by Ms. Mora and Ms. Alvarado's related testimony as evidence supporting the verdict against defendant, but that evidence is affected by the issues surrounding Ms. Mora's recanted preliminary hearing testimony. Specifically, without Ms. Mora's preliminary hearing testimony regarding the veracity of her text messages, Ms. Alvarado's action in reliance on those texts is of little evidentiary weight. Thus, the prosecution cannot use the text messages (standing alone) as evidence without relying on the preliminary hearing testimony that was erroneously admitted without the counterbalancing measures discussed herein. In the absence of the text messages, the remaining evidence consists of Deputy Wong's testimony, including her observation of Ms. Mora's injuries, recovery of the gun from the closet, and the admission by defendant that he had struggled with Ms. Mora over her purse and had taken his gun out, "checked it to make sure it was unloaded and put it in a safe location." This evidence, alone, is insufficient to support defendant's conviction. For example, there is no evidence that defendant pointed the gun at Ms. Mora, threatened her, or touched her apart from attempting to grab her purse. Thus, "'after an examination of the entire cause, including the evidence'" (*Watson*, *supra*, 46 Cal.2d at p. 836), we conclude that if the evidence of Ms. Mora's recanting of her preliminary hearing testimony had been put before the jury, it is reasonably probable that this evidence would have affected the verdict.

17

**DISPOSITION**

The judgment is reversed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:



EPSTEIN, P. J.



WILLHITE, J.